**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

UNITED STATES OF AMERICA,

      Plaintiff,

                                          1:18-CR-02648-DHU-7

v.

RAFAEL COLUMBIE,

      Defendant.

**MEMORANDUM OPINION AND ORDER**

This matter comes before the Court on: (1) Defendant Rafael Columbie's Response to Government's Notice of Intention to Offer Expert Testimony of Drug Enforcement Administration Special Agent Simms, Filed September 17, 2021 (Doc. 197); (2) United States' Opposed Motion in Limine to Admit Co-Conspirator Statements Pursuant to Fed R. Evid. 801(D)(2)(E) (Doc. 316); (3) United States' Opposed Motion in Limine to Admit Voice Recognition Evidence Through Lay Witnesses (Doc. 321); (4) United States' Opposed Motion in Limine to Admit Transcripts of Recorded Telephone Conversations and Text Messages (Doc. 322); and (5) United States' Opposed Motion in Limine to Prohibit Discussion of Sentencing or Punishment at Trial (Doc. 323).

On November 14, 2022, the Court held a hearing and heard argument on the above motions. The Court placed its rulings on the record for the United States' Opposed Motion in Limine to Prohibit Discussion of Sentencing or Punishment at Trial (Doc. 323) and the United States' Opposed Motion in Limine to Admit Voice Recognition Evidence Through Lay Witnesses (Doc. 321). Relying on the applicable law and for all of the reasons stated on the record, this Order memorializes the Court's November 14, 2022 rulings. In sum, regarding the United States'

1

Opposed Motion in Limine to Admit Voice Recognition Evidence Through Lay Witnesses (Doc. 321), the Court granted the motion.  The Government may admit the voice recognition evidence assuming it lays the proper foundation, including through testimony that meets the standard set forth in Federal Rule of Evidence 901(b)(5).  However, defense counsel may request to voir dire the voice recognition witness at trial, outside the jury's presence, regarding the basis of the witness's familiarity with Defendant's voice.

Regarding the United States' Opposed Motion in Limine to Prohibit Discussion of Sentencing or Punishment at Trial (Doc. 323), the Court granted this motion.  Defendant argued such an order is not necessary and if a discussion of sentencing or punishment arises at trial, it would be the "duty of the prosecutor to object at the appropriate time."  Doc. 333 at 1.  However, "[u]nless a statute specifically requires jury participation in determining punishment, the jury shall not be informed of the possible penalties." *United States v. Parrish*, 925 F.2d 1293, 1299 (10th Cir. 1991) (overruled on other grounds).  For this reason and all of the reasons explained on the record, the Court concludes that the defense shall not put the issue of sentencing or punishment before the jury.

The Court took the three remaining motions under advisement.  As such, the remainder of this Order sets forth the Court's ruling on these three motions.

## I.   Defendant Rafael Columbie's Response to Government's Notice of Intention to Offer Expert Testimony of Drug Enforcement Administration Special Agent Simms, Filed September 17, 2021 (Doc. 197).

The Government provided notice of its intent to offer Special Agent Jeffrey Simms of the Drug Enforcement Administration as an expert witness at trial.  *See* Doc. 187 at 8; *see also* Doc. 313 at 8.[1]  The Government intends to offer Special Agent Simms as "an expert in drug trafficking,

---

[1] The Government filed its initial *Sealed Notice of Intent to Offer Expert Witness Testimony* on September 17, 2021 Doc. 187.  Defendant responded to this initial Notice to challenge the expert testimony of Special Agent Simms.  *See*

to include ways, manner, means and methods of trafficking in controlled substances (hereinafter, 'drug trafficking'), including pricing, packaging, transportation, and differentiating between distribution and personal use," Doc. 187 at 8, and the Government identifies specific matters related to drug trafficking to which Special Agent Simms may testify. *Id.* at 9-11. The Government also provides notice that Special Agent Simms "will testify that based on his knowledge, skill, experience, training and education, the evidence in this case is consistent with distribution and the possession with intent to distribute." *Id.* at 11.

Pursuant to Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), Defendant requests that the Court "exclude any proposed expert testimony of the Government by Drug Enforcement Administration (DEA) Special Agent, Jeffery A. Simms," Doc. 197 at 1, and "allow Agent Simms to testify only as a lay witness." *Id.* at 4. Defendant puts forth three arguments. First, "Agents Simms proposed expert testimony about whether the case is consistent with distribution and possession with intent to distribute, will result in the Special Agent Simms stating his opinion about Rafael Columbie's alleged intent to distribute controlled substances, in violation of Rule 704(b) of the Federal Rules of Evidence." *Id.* at 2. Second, "Agent Simms is not sufficiently qualified to offer expert opinions about whether the case is consistent with distribution and possession with intent to distribute." *Id.* And finally, "Agent Simms' proposed testimony does not reflect specialized knowledge." *Id.* at 3. In sum, "Agent Simms' lay testimony will carry significant weight because he will be presented as a uniformed Federal Agent, and the public generally respects or at least considers the statements of a uniformed

---

Doc. 197. The Government subsequently filed a its *First Amended Notice of Intent to Offer Expert Witness Testimony*. Doc. 313. The Government noted that the only difference to the amended Notice was the inclusion of an additional witness and the "amended notice otherwise contains no substantive changes." Doc. 313 at 1, n.1. For ease of reference, the Court will refer only to the Government's initial Notice, Doc. 187, for the remainder of this Order.

agent . . . The jury will not need an expert explanation in order to understand Agent Simms'
anticipated testimony because it is not overwhelmingly complicated or scientific." *Id.*

The Government opposes Defendant's request and moves the Court to "deny Defendant's
request without a hearing." Doc. 324 at 7. The Government argues that Agent Simms "will not
opine on Columbie's mental state" so his testimony will not violate Rule 704(b). *Id.* at 2. Next,
the Government argues Agent Simms is qualified to present all of the proposed testimony, and his
proposed testimony reflects specialized knowledge. *See id.* at 2, 3. Finally, the Government
asserts the Agent's testimony will aid the jury. *See id.* at 5. The Court, having considered the
parties' motions, evidence, applicable law, and otherwise being fully advised, **GRANTS IN
PART AND DENIES IN PART** Defendant's request to exclude the expert testimony of Agent
Simms.

### A.  Legal Standards

Federal Rule of Evidence 702 controls the admission of expert witness testimony. Rule
702 provides that:

> a witness who is qualified as an expert by knowledge, skill, experience, training, or
> education may testify in the form of an opinion or otherwise if:
>
>> (a) the expert's scientific, technical, or other specialized knowledge
>> will help the trier of fact to understand the evidence or to determine
>> a fact in issue;
>> (b) the testimony is based on sufficient facts or data;
>> (c) the testimony is the product of reliable principles and methods;
>> and
>> (d) the expert has reliably applied the principles and methods to the
>> facts of the case.

Fed. R. Evid. 702.

In evaluating the admissibility of expert testimony, "the district court must satisfy itself
that the proposed expert testimony is both reliable and relevant, in that it will assist the trier of

fact, before permitting a jury to assess such testimony." *United States v. Nacchio*, 555 F.3d 1234, 1241 (10th Cir. 2009) (en banc) (quotation marks omitted).  First, the district court must "determine whether the expert is qualified 'by knowledge, skill, experience, training, or education' to render an opinion." *Id.* (quoting Fed. R. Evid. 702).  Second, if the expert is sufficiently qualified, the district court "must determine whether the expert's opinion is reliable by assessing the underlying reasoning and methodology." *Id.*  Third, the court must determine whether the testimony is relevant. *United States v. Archuleta*, 737 F.3d 1287, 1296 (10th Cir. 2013).

Concerning an expert's qualifications, Rule 702 sets forth "liberal standard" for qualifying a witness as an expert.  *United States v. Gomez*, 67 F.3d 1515, 1525-26 (10th Cir. 1995).

Concerning reliability, Rule 702 requires the district court as part of its gatekeeping duties to assess "the underlying reasoning and methodology" of the expert. *Schulenberg v. BNSF Ry. Co.*, 911 F.3d 1276, 1282 (10th Cir. 2018). In conducting this analysis, the court should consider the following non-exhaustive and non-dispositive factors: "(1) whether the particular theory can be and has been tested; (2) whether the theory has been subjected to peer review and publication; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; and (5) whether the technique has achieved general acceptance in the relevant scientific or expert community." *United States v. Baines*, 573 F.3d 979, 985 (10th Cir. 2009) (citing *Daubert v. Merrell Dow Pharm.*, 509 U.S. 579, 593-94 (1993)).  *Daubert* was limited to scientific evidence. *Id*.  *Kumho Tire Co. v. Carmichael,* 526 U.S. 137 (1999), covers non-scientific expert testimony.  *See United States v. Medina-Copete*, 757 F.3d 1092, 1101 (10th Cir. 2014). "Rule 702 expressly contemplates that an expert may be qualified on the basis of experience.  In certain fields, experience is the predominant, if not sole, basis for a great deal of reliable expert testimony." Fed. R. Evid. 702 advisory committee's note to 2000 amendment.

The third step, relevancy, focuses on whether expert testimony "advances the trier of fact's understanding to any degree." *Archuleta*, 737 F.3d at 1297. "[C]ourts must conduct a common-sense inquiry into whether a juror would be able to understand certain evidence without specialized knowledge." *United States v. Gutierrez de Lopez*, 761 F.3d 1123, 1136 (10th Cir. 2014) (citation and quotation marks omitted). "Doubts about whether an expert's testimony will be useful should generally be resolved in favor of admissibility unless there are strong factors such as time or surprise favoring exclusions." *Id.* The proponent of the expert bears the burden of proof to show that the expert's testimony is reliable and relevant. *Nacchio*, 555 F.3d at 1241.

**B.  Analysis**

First, the Court finds Agent Simms is qualified by knowledge, skill, experience, training or education to render an opinion regarding drug trafficking in general and because of this, he is also qualified to render an opinion about whether the evidence in this case is consistent with distribution and possession with intent to distribute.[2] Agent Simms has been a DEA Special Agent for over fifteen years.  See Govt.'s Ex. 85.  He has received training in controlled substance identification, interview and interrogation training, preparation of search warrants, surveillance and electronic monitoring techniques, and the methods of operation of drug trafficking organizations. He has since led hundreds of drug trafficking investigations, authored hundreds of search warrants, and interviewed numerous confidential sources, defendants, and witnesses on the tools and techniques used in the drug trafficking world.  He also teaches other agents, including a course on Basic Drug Investigator School and Managing Undercover Operations.  At the hearing,

---

[2] Though the Government requested the Court decide Defendant's objection to Agent Simms' testimony without a hearing, the Court held a hearing on Defendant's request to exclude Agent Simms' expert testimony.  "Generally, the district court performs [its gatekeeping] function at a *Daubert* hearing, although such a hearing is not specifically required." *Burlington Northern & Santa Fe Ry. Co. v. Grant*, 505 F.3d 1013, 1031 (10th Cir. 2007).  The Court held a hearing because it has "considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable."  *Kumho*, 526 U.S. at 152.

he expressed sufficient familiarity with the evidence in this case for the Court to find that he is qualified to render an opinion about whether the evidence in this case is consistent with distribution and possession with intent to distribute.

Second, the Court finds that Agent Simms' opinion regarding both drug trafficking in general and his more specific opinion about the evidence in this case is reliable. This finding is based on his experience as a law enforcement agent and the specialized knowledge he has obtained as a result of that experience. *See* Fed. R. Evid. 702 advisory committee's note to 2000 amendment; *see also United States v. Garza*, 566 F.3d 1194, 1199 (10th Cir. 2009) ("police officers can acquire specialized knowledge of criminal practices and thus the expertise to opine" on certain matters without having to satisfy the four *Daubert* reliability factors.); *see also United States v. Duran*, 941 F.3d 435, 452 (10th Cir. 2019) (agent's "16 years' experience in law enforcement, including observation of 75 to 100 drug deals and more than 50 controlled buys" allowed him to testify as an expert on drug code words).

Third, Agent Simms' expert opinion about general drug trafficking concepts is relevant, as is his opinion about the evidence in this case, because both opinions will advance the juror's understanding of the evidence. *See Archuleta*, 737 F.3d at 1297; *see also Gutierrez de Lopez*, 761 F.3d at 1136. "Means and methods used by persons and drug traffickers to purchase, manufacture, store, and distribute drugs" likely falls within the category of "a drug dealer's tools of the trade [which] are an appropriate subject for expert testimony." *Medina-Copete*, 757 F.3d at 1102. The Agent's expert testimony about code words used in the drug trafficking realm will likely aid the jury in understanding the evidence in this case. *See United States v. Quintana*, 70 F.3d 1167, 1171 (10th Cir. 1995) (detective's expert testimony that "term 'ball' meant 'one 8th of an ounce of cocaine, an 8 ball'" and that "150 for every 9 [meant] $150 for every 9 ounces of cocaine ... clearly

fell within the parameters of Rule 702 ….”); *see also United States v. Walker*, 179 F. App'x 503, 507 (10th Cir. 2006) (“in narcotics cases, expert testimony [by a law enforcement officer] can assist the jury in understanding transactions and terminology.”).

However, Agent Simms will not be permitted to testify that the evidence in this case is consistent with distribution and the possession with intent to distribute.  Under Rule 704(b), “[i]n a criminal case, an expert witness must not state an opinion about whether the defendant did or did not have a mental state or condition that constitutes an element of the crime charged or of a defense.” Fed.R.Evid. 704(b).  The Tenth Circuit has interpreted this Rule as “prevent[ing] experts from expressly stating the final conclusion or inference as to a defendant's mental state,” but “not prevent[ing] the expert from testifying to facts or opinions from which the jury could conclude or infer the defendant had the requisite mental state.”  *United States v. Archuleta*, 737 F.3d 1287, 1297 (10th Cir. 2013) (quoting *United States v. Goodman*, 633 F.3d 963, 970 (10th Cir. 2011)).

It is appropriate for Agent Simms to testify as an expert in drug trafficking on a general level so that he can aid the jury in understanding the evidence, and from his opinion, the jury can conclude or infer whether Defendant had the requisite mental state.  However, it would be improper for the agent to offer an opinion about whether the evidence in this case was consistent with distribution and possession with intent to distribute because this would result in him opining about Defendant's intent, which is prohibited by Rule 704(b).  *See United States v. Muldrow,* 19 F.3d 1332, 1338 (10th Cir. 1994) (admission of veteran police officer's expert testimony about quantities of cocaine that would be used for distribution purposes was not an abuse of discretion because this specialized knowledge assisted the jury in understanding the significance of the amount of cocaine in the case, and officer “did not offer an opinion on whether Defendant

possessed the 4.4 kilos for personal use or for distribution" and officer "did not go outside his specialized knowledge by opining about Defendant's actual intent.").

In light of the above, Agent Simms will be permitted to testify as an expert about the following general subjects related to drug trafficking:[3]

1. methods used to transport drugs, including the roles played by various individuals, and how drugs are transported from foreign countries for distribution in the United States. Participants include, but are not limited to, transporters of drugs and/or money; individuals assigned to keep and maintain stash locations for drugs and currency; and individuals who establish and maintain facilities where drugs and money can be loaded and offloaded for further distribution, as well as street-level distributors.

2. The importation of drugs, including cocaine, methamphetamine, and heroin, from foreign countries, including Mexico; the means and methods by which cocaine, methamphetamine, and heroin are smuggled into the United States.

3. The transportation methods and routes for illegal drugs, including the use of couriers.

4. The pricing of illegal drugs throughout these various stages of transportation/distribution.

5. Indicia of drug distribution versus personal use, as well as tools of the trade that are typically associated with each.

6. The manner in which drugs are packaged for sale.

7. The methods and manner drug traffickers use to communicate by using telephones and electronic communications. Most notably, the common practices of drug traffickers regarding the use of multiple telephones/devices, pre-paid telephones, and the practice of obtaining new telephones/devices/PINS and/or telephone numbers on a frequent basis to avoid detection by law enforcement.

8. The use of false or fictitious names to subscribe to telephones/devices/bank accounts/vehicles to hide the true identities of the users.

9. The coded language used by drug traffickers to communicate.

---

[3] The Court omitted three of the Government's proposed topics because the Court did not hear testimony from Agent Simms regarding these subjects at the *Daubert* hearing.  Specifically, Agent Simms will not testify regarding the means used by drug traffickers to evade law enforcement, *see* Doc. 187 at 9; the preference of drug traffickers to operate using cash transactions and the methods used by drug traffickers to hid their illicit drug meaning, *see id.*; that drug traffickers may use, carry and possess firearms. *See id.* at 11.  The Government also proposed testimony regarding the "pricing of drugs throughout these various stages of transportation/distribution, to include the 'fronting' of drugs," *id.* at 9, but because the Court did not hear testimony on the specific point of "fronting" drugs, the Agent will not testify on "the fronting of drugs."  Finally, the Government proposed testimony on the "use of cutting agents," *id.* at 10, but because the Court did not hear testimony on this point, the Agent will not testify regarding "the use of cutting agents."

10. How agents use various investigative techniques, including, but not limited to, confidential sources, undercover agents, surveillance, cellular phone location information, and vehicle tracking devices, to investigate drug trafficking organizations.[4]

Agent Simms may testify about these matters as an expert, but he may not directly link his opinions to the evidence this case for all of the reasons stated above.[5]  This restriction precludes the Government from presenting questions to Agent Simms that indirectly refer to the facts of this case.  For instance, the Court will not allow the Government to use hypotheticals that reference the exact amount of drugs found in this case or any other specific fact of this case.

## II.   United States' Opposed Motion in Limine to Admit Co-Conspirator Statements Pursuant to Fed R. Evid. 801(D)(2)(E) (Doc. 316).

Next, the Government seeks a "pretrial evidentiary ruling that certain co-conspirator statements the United States will seek to introduce at trial satisfy the requirements under Rule 801(d)(2)(E), and are thus admissible."  Doc. 316 at 1.  The Government requested the Court conduct a *James* hearing on the admissibility of co-conspirator statements.[6]  *Id.* at 23.  Defendant concurred with Defendant's request for a pretrial hearing pursuant to *United States v. James*, 590 F.2d 575 (5th Cir. 1979).  Doc. 334 at 1.  Defendant stated the Court "should scrutinize the alleged co-conspirator statements to assess whether each of the requirements of the co-conspirator rule are met, including whether there is evidence of the existence of a conspiracy which involves Mr. Columbie at the time of the proffered statements," and Defendant objected to the admission of the

---

[4] Agent Simms will not testify regarding "wiretap intercepts" as the Government initially proposed, because the Government notified the Court at the hearing that it will use a different agent to testifying regarding that technique.

[5] If the Government offers Agent Simms as an expert consistent with this Order, the Court will not permit Agent Simms to also testify as a lay witness regarding the specific evidence in this case.

[6] "A *James* hearing is an evidentiary hearing to establish the existence of a predicate conspiracy for purposes of Rule 801(d)(2)(E). It is named for the case where it originated, *United States v. James*, 590 F.2d 575 (5th Cir. 1979)." *United States v. Otuonye*, 995 F.3d 1191, 1204 n.14 (10th Cir. 2021). "The 'preferred procedure of this circuit' is to hold a James hearing outside the jury's presence to make preliminary findings as to whether" the Rule 801(d)(2)(E) requirements are satisfied. *United States v. Stein*, 985 F.3d 1254, 1269 (10th Cir. 2021) (quoting *United States v. Alcorta*, 853 F.3d 1123, 1138 (10th Cir. 2017)).

co-conspirator statements under the Sixth Amendment's Confrontation Clause.  *Id.* at 3.  The Court held a *James* hearing on November 14, 2022.  The Court, having considered the parties' motions, evidence, applicable law, and otherwise being fully advised, **GRANTS** the Government's motion to admit the proffered statements pursuant to Fed. R. Evid. 801(d)(2)(E).

### A.  Legal Standards

Federal Rule of Evidence 801(d)(2)(E) provides that a statement is "not hearsay" if it "is offered against an opposing party" and it "was made by the party's coconspirator during and in furtherance of the conspiracy."  "The rationale for both the hearsay-conspiracy exception and its limitations is the notion that conspirators are partners in crime …. As such, the law deems them agents of one another." *Anderson v. United States*, 417 U.S. 211, 218 n.6 (1974) (citations omitted).  Moreover, the statements of co-conspirators have a unique evidentiary value that is rarely capable of duplication in live testimony at trial. *United States v. Inadi*, 475 U.S. 387, 395-96 (1986).

 "Before admitting statements into evidence under the coconspirator exception to the hearsay rule, the district court must determine by a preponderance of the evidence that (1) a conspiracy existed, (2) the declarant and the defendant were both members of the conspiracy, and (3) the statements were made in the course of and in furtherance of the conspiracy." *Alcorta*, 853 F.3d at 1137; *Bourjaily v. United States*, 483 U.S. 171, 175-76 (1987).  The preponderance of the evidence standard merely means "more likely than not." *Bourjaily*, 483 U.S. at 175.

Whether the Rule 801(d)(2)(E) standard is satisfied is a "preliminary question about whether ... evidence is admissible," meaning the district court "is not bound by evidence rules, except those on privilege," when resolving the question. Fed. R. Evid. 104(a); *Bourjaily*, 483 U.S. at 178-79. As the offering party, the government bears the burden of showing the preliminary facts

by a preponderance of the evidence. *United States v. Perez*, 989 F.2d 1574, 1577 (10th Cir. 1993) (en banc).

"The court may consider both independent evidence and the statements themselves" in determining whether the coconspirator exception applies. *Rutland*, 705 F.3d at 1248; *see also Bourjaily,* 483 U.S. at 180 ("there is little doubt that a co-conspirator's statements could themselves be probative of the existence of a conspiracy and the participation of both the defendant and the declarant in the conspiracy"). The Tenth Circuit requires "at most that there be some independent evidence linking the defendant to the conspiracy." *Alcorta*, 853 F.3d at 1142; *see also United States v. Rascon*, 8 F.3d 1537, 1541 (10th Cir. 1993) ("most courts require some reliable corroborating evidence apart from the coconspirator's statements before those statements may be used"). However, the independent evidence "need not be 'substantial.'" *Alcorta*, 853 F.3d at 142.

### B.  Analysis

#### i.  Existence of a Conspiracy

To admit the alleged co-conspirator hearsay, the Court must first find that a conspiracy existed and that Defendant and the declarant were members of that conspiracy. *See Alcorta*, 853 F.3d at 1137. To find that a conspiracy existed, there must be proof of four elements: (1) there was an agreement to violate the law; (2) the declarant knew the essential objectives of the conspiracy; (3) the declarant knowingly and voluntarily took part in the conspiracy; and (4) the co-conspirators were interdependent. *United States v. Rutland*, 705 F.3d 1238, 1249 (10th Cir. 2013) (citation omitted).

Concerning the first element, an agreement to violate the law, in 21 U.S.C. § 846 conspiracy cases an agreement to violate the law "need not be explicit, but rather may be inferred from the facts and circumstances of the case. An agreement to distribute drugs can sometimes 'rationally be inferred' from 'frequent contacts' among the defendants and from 'their joint

appearances at transactions and negotiations.'" *United States v. Evans*, 970 F.2d 663, 669 (10th Cir. 1992) (quoting *United States v. Esparsen*, 930 F.2d 1461, 1472 (10th Cir. 1991)).

Regarding the second element, to prove knowledge of the essential objectives of a conspiracy, the government does not have to show the defendant knew all the details or all the members of a conspiracy. *United States v. Small*, 423 F.3d 1164, 1182 (10th Cir. 2005). "Rather, the government only needs to demonstrate the defendant shared a common purpose or design with his alleged co-conspirators." *United States v. Yehling*, 456 F.3d 1236, 1240 (10th Cir. 2006) (citing *Evans*, 970 F.2d at 669). "[B]ecause a criminal conspiracy by its very nature is usually shrouded in a further conspiracy of silence, the common plan or purpose must often be, and may legitimately be, proved by circumstantial evidence." *United States v. Hamilton*, 587 F.3d 1199, 1206 (10th Cir. 2009) (citation and internal quotation marks omitted).

Under the third element, participation, "[a] conspirator 'need not know of the existence or identity of the other members of the conspiracy or the full extent of the conspiracy,' but he or she must have a 'general awareness of both the scope and the objective of the enterprise to be regarded as a coconspirator.'" *United States v. Pickel*, 863 F.3d 1240, 1252 (10th Cir. 2017) (quoting *Evans*, 970 F.2d at 669-70). "[M]erely associating with known criminal conspirators or purchasing drugs for personal use is insufficient to prove participation in a conspiracy; rather, the defendant's participation must share a common purpose or design with his co-conspirators." *Id.* (citation omitted).

The fourth element of conspiracy, interdependence, is the "focal point of the analysis is whether the alleged co-conspirators' conduct exhibited interdependence." *United States v. Caldwell*, 589 F.3d 1323, 1329 (10th Cir. 2009) (quoting *United States v. Edwards*, 69 F.3d 419, 432 (10th Cir. 1995)). In the context of drug conspiracies, for example,

It is not enough that a group of people separately intend to distribute drugs in a single area, nor even that their activities occasionally or sporadically place them in contact with each other. People in the same industry in the same locale (even competitors) can occasionally be expected to interact with each other without thereby becoming co-conspirators. What is needed is proof that they intended to act *together* for their *shared mutual benefit* within the scope of the conspiracy charged.

*Id.* at 1330 (quoting *Evans,* 970 F.2d at 670-71) (emphases in original).

Interdependence "may be shown when a defendant's activities 'facilitated the endeavors of other alleged co-conspirators or facilitated the venture as a whole.'" *Pickel*, 863 F.3d at 1252-53 (quoting *United States v. Acosta-Gallardo*, 656 F.3d 1109, 1124 (10th Cir. 2011)). "[O]f principal concern is whether the activities of alleged co-conspirators in one aspect of the charged scheme were necessary or advantageous to the success of the activities of co-conspirators in another aspect of the charged scheme, or the success of the venture as a whole." *Id.* at 1253 (citation omitted). "[A] single act can be sufficient to demonstrate interdependence." *Caldwell*, 589 F.3d at 1329 (citing *Hamilton,* 587 F.3d at 1208–09).

With this background in mind, the Court concludes that the Government has met its burden of showing by a preponderance of the evidence the existence of a conspiracy to distribute methamphetamine in violation of 21 U.S.C. § 846 as charged in Count 1 of the Second Superseding Indictment.[7]   The Government presented evidence of numerous communications between Defendant and co-conspirators regarding prices, quantities, logistics, travel and coordination related to drug deals from about July 7, 2018 to about July 18, 2018; communications describing the actions of co-conspirators; the use and meaning of drug trafficking code words; the seizure of methamphetamine on July 18, 2018 from a truck occupied by Defendant, as well as other evidence. In combination, the evidence presented shows that Defendant and his co-conspirators acted

---

[7] The Government's motion refers to the superseding indictment.  *See* Doc. 316 at 10.  After the motion was filed, a second superseding indictment was filed.  *See* Doc. 330.  The Court limits its analysis to the conspiracy as charged in the Second Superseding Indictment.

together for their shared mutual benefit to obtain and distribute methamphetamine. Considering all of the evidence, the Government has met its burden.

### ii.   Defendant and the Declarants Were Members of the Conspiracy.

Based on all of the evidence, the Court concludes that the Government has proven by a preponderance of the evidence that Defendant and the declarants—Benjamin Collin-Rivera and Jesus M. Lopez—were members of the conspiracy.  This is proven not only by the calls and text messages themselves, but also by Defendant's other calls and messages with the co-conspirators regarding drug transactions, travel plans to obtain drugs, and phone extraction reports showing the combined contacts between Defendant and the declarants from July 7, 2018 through July 18, 2018, as well as Defendant being found in a truck with a distribution-quantity of methamphetamine on July 18, 2018 and law enforcement's surveillance of the interactions between Defendant and the declarants.  A preponderance of the evidence shows that the declarants and Defendant were members of the conspiracy.

### iii.   Statements Were Made During and in Furtherance of the Conspiracy.

The third prerequisite for admissibility under Rule 801(d)(2)(E) is that the statements "were made in the course of and in furtherance of the conspiracy." *Alcorta*, 853 F.3d at 1137. A co-conspirator statement is made "during the course" of the conspiracy "if it is made before the objectives of the conspiracy have either failed or been achieved." *Owens*, 70 F.3d at 1126 (internal quotation marks omitted). Statements made by co-conspirators during the conspiracy are admissible against a defendant who subsequently joins the conspiracy. *United States v. Brown*, 943 F.2d 1246, 1255 (10th Cir. 1991). However, to avoid improperly broadening the scope of conspiracy prosecutions, the Court "must carefully ascertain the nature and extent of a conspiracy in determining whether acts or statements can properly be viewed as made during its existence." *Perez*, 989 F.2d at 1579.

"In furtherance" means that the statements are "intended to promote the conspiratorial objectives." *Rutland*, 705 F.3d at 1252 (quoting *Townley*, 472 F.3d at 1273). This requirement is meant "to strike a balance between the great need for conspirators statements in combating undesirable criminal activity which is inherently secretive and difficult of proof, and the need to protect the accused against idle chatter of criminal partners as well as inadvertently misreported and deliberately fabricated evidence." *Alcorta*, 853 F.3d at 1137 (quoting *Perez*, 989 F.2d at 1578). The Tenth Circuit requires courts to interpret the "in furtherance" requirement "narrowly" and in a way that is "protective of defendants." *Perez*, 989 F.2d at 1578 (citation omitted). The focus is on the declarant's intent to further the conspiracy in making the statement, rather than on the statement's effect. *Id.* "No talismanic formula exists for ascertaining whether a particular statement was intended by the declarant to further the conspiracy and is therefore admissible in accordance with the agency theory of conspiracy. To the contrary, this determination must be made by examining the context in which the challenged statement was made." *Id.* at 1578-79.

Examples of statements the Tenth Circuit has held to be in furtherance of a conspiracy include

> statements explaining events of importance to the conspiracy, statements between co-conspirators which provide reassurance, which serve to maintain trust and cohesiveness among them, or which inform each other of the current status of the conspiracy, statements identifying a fellow coconspirator, and discussions of future intent that set transactions to the conspiracy in motion or that maintain the flow of information among conspiracy members.

*Id.* Additionally, statements identifying members of a conspiracy, discussing particular roles of other co-conspirators, and avoiding detection by law enforcement personnel are made "in furtherance of" a conspiracy. *United States v. Williamson*, 53 F.3d 1500, 1520 (10th Cir. 1995).

On the other hand, "statements are not in furtherance of the conspiracy if they are mere narratives, that is statements relating to past events, even those connected with the operation of the

conspiracy where the statement serves no immediate or future conspiratorial purpose." *Alcorta*, 853 F.3d at 1137 (internal quotation marks omitted); *United States v. Wolf*, 839 F.2d 1387, 1393 (10th Cir. 1988) ("mere narratives are statements by a coconspirator which were either mere conversations or casual admissions of culpability to someone [they] had decided to trust") (citation and internal quotation marks omitted).

Applying this standard, the Court concludes that the Government has met its burden of showing that all the proffered statements were made in furtherance of the conspiracy.[8]

**Statements 1 and 2**:  The Court concludes that these statements are admissible under Rule 801(d)(2)(E) because "statements of identity and of a particular individual's role in the conspiracy" are in furtherance of a conspiracy.  *Williamson*, 53 F.3d at 1520.  These statements include reference to the identity of Defendant and Lopez by their monikers.  In addition, Statement 2 includes an instruction to let Defendant know Lopez ("Boy") called, indicating future coordination related to the conspiracy.

**Statements 5, 6, 13, 29, 31, 32, 34, 36, 40, 44, 45, 46, 47 and 49:** The Court concludes that all of these statements direct or facilitate particular actions which the Government has shown by sufficient evidence were a part of the alleged predicate conspiracy to distribute methamphetamine.  The statements include discussion among the co-conspirators regarding drug orders and prices, arranging payment for drugs, arranging travel plans to obtain drugs, securing payment from others, the status of plans to obtain drugs, and updates on the status of drug

---

[8] The Court uses the numbering laid out in Government's motion.  *See* Doc. 316 at 13-22.  The Government included 52 statements in total, but 36 of these were provided for "context" and the Government intends to introduce these statements as statements of a party opponent pursuant Fed. R. Evid. 801(d)(2)(A).  Therefore, these 36 statements are "not subject to the admissibility analysis for co-conspirator statements."  Doc. 316 at 13.  The Government intends to introduce 16 of the 52 statements as co-conspirator statements.  *Id.*  The Court's analysis is therefore limited to these 16 co-conspirator statements.

purchases.[9]  *See United States v. Caro*, 965 F.2d 1548, 1557 (10th Cir. 1992) (intercepted phone calls of co-conspirators discussing "drug-related conversations" to "facilitate[ ] meetings … clearly furthered the conspiracy …."); *see also Alcorta,* 853 F.3d at 1141 (holding statements "could reasonably be viewed as in furtherance of the ongoing conspiracy because they comforted co-conspirators that they would be taken care of (so that they would perform their tasks and remain loyal), kept co-conspirators advised of the ongoing investigation (so that they could take proper precautions and make appropriate plans), or helped them execute their tasks").  The Court concludes that a preponderance of the evidence shows that Statements 5, 6, 13, 29, 31, 32, 34, 36, 40, 44, 45, 46, 47 and 49 were part of the alleged predicate conspiracy and are admissible under Rule 801(d)(2)(E).[10]

### III.   United States' Opposed Motion in Limine to Admit Transcripts of Recorded Telephone Conversations and Text Messages (Doc. 322).

Finally, the Government requests an "order admitting English-language transcripts of recorded Spanish language telephone conversations and text messages."  Doc. 322 at 1.  The Court addresses the sub-issues that have arisen regarding this request.

#### A.  Transcripts May be Used as Demonstrative Aids.

The Government argues that the Tenth Circuit has "repeatedly affirmed the admission of such transcripts, provided that a proper cautionary instruction is provided and the original recordings are also admitted."  *Id.* at 1.  The Government also argues that the "best-evidence rule does not prohibit the introduction of these transcripts," and "[o]nce district courts have admitted

---

[9] While it is true that these communications do not explicitly include the word "methamphetamine," the Court heard testimony during the hearing regarding the drug-related meaning of code words used in these telephone calls and text messages.  At this stage, this testimony is sufficient for the Court's analysis of the co-conspirator statements.

[10] The Defendant also made a cursory argument that introduction of the statements would violate his rights under the Confrontation Clause.  The Court disagrees as the Tenth Circuit has rejected this argument.  *See United States v. Aguilera-Meza,* 329 F. App'x 825, 833 (10th Cir. 2009) (finding no merit to a defendant's argument that admission of co-conspirator statements violated his Confrontation Clause rights).

these recordings, however, the best-evidence rule clearly permits the admission of translated transcripts." *Id.* at 3.  Finally, the Government requests that the "jury be instructed consistent with the Tenth Circuit's pattern instructions, that it must rely on the recordings, rather than the transcripts, in the event of any apparent differences" and that the jury be permitted to use the transcripts during deliberations.  *Id.* at 4.

Defendant opposes the Government's motion and argues it would be "improper for the Court to allow the prosecution to admit into evidence the English language translations."  Doc. 335 at 1.  Defendant argues that the transcript should only be used as a "demonstrative aid shown to the jury," assuming the telephone conversations and text messages come into evidence and coupled with a limiting instruction.  *Id.*  Defendant's position is that the transcripts should not be admitted into evidence.  *Id.*

"Tenth Circuit law is well-settled that a district court has discretion in admitting the transcription of an audio recording."  *United States v. Hooks*, 551 F.3d 1205, 1216 (10th Cir. 2009).  *See also United States v. Gomez,* 67 F.3d 1515, 1526 (10th Cir. 1995) ("The admission of transcripts to assist the trier of fact lies within the discretion of the trial court."); *United States v. Mittleider*, 835 F.2d 769, 773 (10th Cir. 1987) ("[T]he court [did not] err in allowing the jury to view the written transcripts of the tapes. The transcripts were not admitted into evidence. The court preliminarily instructed the jury that the transcripts were not evidence and had been furnished solely for the purpose of guidance."), *abrogated on other grounds by Staples v. United States*, 511 U.S. 600, 128 L.Ed.2d 608 (1994).  The Tenth Circuit follows this practice for translated recordings:

> Specifically, we have allowed English-translation transcripts of foreign-language recordings only as aids in understanding the *admitted* recordings themselves (i.e., the primary evidence). In other words, under our practice, the English-translation transcript is permitted for use only in conjunction with the foreign-language audio

recording: it is the recording itself—not the transcript of the recording—that constitutes the primary evidence.

*United States v. Chavez*, 976 F.3d 1178, 1196 (10th Cir. 2020).

Transcripts of recordings are only admissible if the recordings themselves are also admitted. *See id.,* 976 F.3d at 1199 ("the best-evidence rule's plain meaning, centuries of common-law wisdom, over forty years of this court's unbroken practice, and the decisions aplenty of our sister circuits, counsel that transcripts of recordings—including English-translation transcripts of foreign-language recordings—are inadmissible unless the recordings, themselves, have been admitted.").

Against this background, the Court will permit the transcripts of the calls and messages to be used as demonstrative aids, assuming the proper foundation for the actual calls and messages is established.  The transcripts will not be admitted as substantive evidence.  However, the Court will allow the transcripts to be viewed by the jury during deliberations should the Government so request.  *See United States v. Downen,* 496 F.2d 314, 320 (10th Cir. 1974) ("submission of papers, documents or articles, whether or not admitted in evidence, to the jury for view during trial or jury deliberations, accompanied by careful cautionary instructions as to their use and limited significance, is within the discretion accorded the Trial Court in order that it may guide and assist the jury in understanding and judging the factual controversy.").[11]

### B.  Ms. Escarcega May Certify the Translated Transcripts.

Defendant also argues that if the transcripts are published to the jury and if

the prosecution wants to translate that evidence to the jury, it must do so through the use of their forensic translation witness.  The government has disclosed their translation witness as Nayely Escarcega.  It appears Ms. Escarcega was not the only

---

[11] At the November 14, 2022 hearing, Defendant objected to only one of the Government's proposed jury instructions: Jury Instruction 17, which is Tenth Circuit Pattern Jury Instruction 1.40.  This instruction addresses transcripts of recorded conversations.  The Court took Defendant's objection under advisement.  The Court will rule on this instruction at trial.

interpreter of the intercepted phone calls/text messages. There are initials at the end of each translated phone/text with someone's initial, which may indicated there were multiple translators. Any such nondisclosed witnesses should be excluded. There is a lack of credentials from the various translators that were used.

*Id.* at 2.

To this argument, the Government responds that "[w]hile it is true that others may have assisted in preparing the written transcripts, if necessary, the government expects that Ms. Escarcega will testify regarding her proficiency speaking the Spanish language, and that she has reviewed the call or text message in question and certifies the English translation as accurate." Doc. 338 at 4.  The Government also referred the Court to *United States v. Rochan*, 563 F.2d 1246, 1251 (5th Cir. 1977).

In *Rochan,* one issue was whether transcripts of a tape recording were inadmissible to aid the jury in listening to the recordings because the stenographer who transcribed the recordings did not authenticate them.  563 F.2d at 1247.  The Fifth Circuit concluded that the stenographer who transcribed the transcript did not need to testify because one of the parties to the conversation testified to the accuracy of the transcript.  *Id.* at 1251.  The Court noted that the issue was "not who made [the transcripts]; the issue is whether they are accurate."  *Id.*  As a result, the Court stated that a "stenographer's testimony is unnecessary if someone else who either heard the tape or participated in the conversation assumes that task" of establishing a transcript's accuracy. Relatedly, "[d]ifferences of opinion on the proper meaning or translation of a slang term are to be resolved—*as with other disputes concerning translation*—through cross-examination or by the presentation of another qualified translator with a contrary view."  *United States v. Verdin-Garcia*, 516 F.3d 884, 893 (10th Cir. 2008).

Against this background, the Court concludes that Ms. Escarcega may certify the accuracy of the translated transcripts, provided that she establishes her training and experience as a translator and that she has reviewed all of the communications in question.[12]

### C.   Use of Transcripts as Demonstrative Aids Does not Violate Rule 604 or Rule 901(b)(6).

Defendant made additional arguments at the November 14, 2022 hearing.  First, Defendant argued that Rule 604 requires an interpreter be qualified as an expert.  This rule provides that "[a]n interpreter must be qualified and must give an oath or affirmation to make a true translation."  Fed. R. Evid. 604.  The Government argued that  the rule does not require that the interpreter be qualified as *an expert*, it merely requires that they be *qualified.*  Without any additional authority on this point, the Court concludes that Rule 604 does not require the Government's translation witness to be qualified as an expert witness.  *See also Verdin-Garcia*, 516 F.3d at 892-93 (where the defendant argued the trial court should have held *Daubert* hearing regarding translated phone calls, but Tenth Circuit concluded that translator's "training and experience provided her with the ability to understand, and therefore to translate" slang term).

Second, Defendant argued that the Government will not be able to lay a sufficient foundation for the transcripts under Rule 901(b)(6).  Rule 901(a) provides, "[t]o satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is."  The rule includes "examples only — not a complete list — of evidence that satisfies the requirement: . . . For a telephone conversation, evidence that a call was made to the number assigned at the time to: (A) a particular person, if circumstances, including self-identification, show that the person

---

[12] On November 18, 2022, the parties notified the Court by email that Defendant has agreed to stipulate that the transcripts are true and accurate transcripts and translations of the original calls and texts.

answering was the one called . . ." Fed. R. Evid. 901(b)(6).  The Court concludes that this rule does not change its analysis.  The Court will not admit the transcripts as evidence, so it is not clear that this rule even applies.  Therefore, Ms. Escarcega may testify regarding the accuracy of the transcripts so long as the Government can establish her translation qualifications and an adequate basis for her certification of the accuracy of the transcripts.

**D.  Confrontation Clause**

At the hearing Defendant argued for the first time that using the translated transcripts would violate his rights under the Sixth Amendment's Confrontation Clause because he will not be able to confront the witnesses who translated the transcripts.  Defendant did not provide authority for this proposition.   The Government argued that this argument may have ben waived as it had not been raised earlier.  The Government also argued there is no Confrontation Clause issue in this case because the question is the reliability of the transcriptions and translations.

The Court is without the benefit of briefing on this subject as it was raised for the first time at the November 14, 2022 hearing.  Defendant may have waived his argument.  *See Bronson v. Swensen*, 500 F.3d 1099, 1105 (10th Cir. 2007) (plaintiff's constitutional challenged waived where it consisted of "cursory statements, without supporting analysis and case law.").  However, even considering the argument, the Court does not find that Ms. Escarcega's testimony will present a violation of the Confrontation Clause.   Assuming Ms. Escarcega is testifying only to the transcripts' accuracy, this will not violate Defendant's Sixth Amendment rights.  *See  United States v. Richard,* 678 F. App'x 927, 940 (11th Cir. 2017) (defendant's Sixth Amendment rights were not violated where the government introduced a witness to confirm a transcript's accuracy after having listened to the original recordings and reviewing another translator's translation, the witness

testified, and the defendant was able to cross-examine the witness).  Therefore, the Court does not anticipate Ms. Escarcega's testimony will infringe on Defendant's Confrontation Clause rights.

## CONCLUSION

For the reasons set forth above, Defendant Rafael Columbie's Response to Government's Notice of Intention to Offer Expert Testimony of Drug Enforcement Administration Special Agent Simms, Filed September 17, 2021 (Doc. 197) is **GRANTED IN PART AND DENIED IN PART;** United States' Opposed Motion in Limine to Admit Co-Conspirator Statements Pursuant to Fed R. Evid. 801(D)(2)(E) (Doc. 316) is **GRANTED;** United States' Opposed Motion in Limine to Admit Voice Recognition Evidence Through Lay Witnesses (Doc. 321) is **GRANTED;** the United States' Opposed Motion in Limine to Admit Transcripts of Recorded Telephone Conversations and Text Messages (Doc. 322) is **GRANTED IN PART AND DENIED IN PART;** and the United States' Opposed Motion in Limine to Prohibit Discussion of Sentencing or Punishment at Trial (Doc. 323) is **GRANTED.**

**IT IS SO ORDERED.**

_____

DAVID HERRERA URIAS
United States District Judge

24